**CORPORATION OF AMERICA v.
McLAUGHLIN, Collector of
Internal Revenue.**

No. 8649.

Circuit Court of Appeals, Ninth Circuit.
Nov. 22, 1938.

HEALY, Circuit Judge, dissenting in part.

Claude I. Parker, John B. Milliken, and Bayley Kohlmeier, all of Los Angeles, Cal., for appellant.

James W. Morris, Asst. Atty. Gen., Sewall Key, E. F. McMahon, and Maurice J. Mahoney, Sp. Assts. to Atty. Gen., and Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This appeal is from a judgment in favor of appellee in a suit at law on two causes of action to recover amounts paid as documentary internal revenue stamp taxes, assessed and collected as upon transfers of rights to receive shares and of interests in corporate profits and accumulations under Title VIII (section 800 et seq.), Schedule A–3 of the Revenue Act of 1926, 44 Stat. 99, 101.

## FIRST CAUSE OF ACTION.

The case was heard below on an agreed statement of facts. From these it appears that appellant corporation was organized to be managed in coordination with the Bank of Italy and for the benefit of the persons who were stockholders of the latter. In 1917 the stock of appellant was offered for subscription exclusively to the stockholders of the Bank of Italy and subscribed for by them. The subscription agreement, however, was between these persons as individuals and the Corporation of America.*

On June 30, 1917, a trust agreement was entered into between A. P. Giannini and two others, as trustees, the first parties to the agreement, and the subscribers to appellant's stock, as parties of the second part. All the subscribers signed the trust agreement. As provided by its terms, the original stock issue of 30,000 shares of appellant, so previously subscribed by the second parties, was made directly to the trustees.

The trust agreement recites the desire of the parties that appellant shall be operated and managed in harmony with the operation and management of the Bank of Italy, to which end consent in writing is sought of all the subscribers to the stock of appellant. By the terms of the agreement the subscribers transferred and surrendered to the trustees (who were the members of the Bank's executive committee) their rights, title and interest in all the shares of appellant for which they had subscribed, upon the trusts declared therein. During the life of the trust the trustees were vested with the rights and powers of absolute owners of the stock, except as otherwise provided, and except also to the extent that the trustees might receive directions from at least two-thirds in interest of the beneficial owners. By the agreement the appellant was empowered and directed to issue to the trustees its certificates for the 30,000 shares then subscribed for, to be held by them during the life of the trust.

The trust was to continue so long as the Bank of Italy, or its successor, continue to do a banking business, unless sooner terminated by two-thirds of the beneficiaries who at once had their equity in the Corporation of America and were owners of the stock of the Bank of Italy, by expiration of the Bank of Italy's charter or that of its successor, or upon the death of all the natural persons who, on the date of the agreement, were stockholders of the Bank. At the end of the term of trust the 30,000 shares of stock of appellant held by the trustees were to belong absolutely and were to be delivered to those who, at that time, should own the beneficial interest therein.

It was provided that the only evidence of such interest of any person in the stock of appellant should be by endorsement on the back of all issued certificates of stock of the Bank. The beneficial interest was

---

* Appellant Corporation of America had previously been differently named. The corporate identity remained unchanged and there is no significance in the difference of names on the certificates transferred.

to pass with the transfer of the shares of the Bank represented by its certificates, and was made otherwise inalienable.

This term of this trust agreement concerned only the original 30,000 shares. It made no provision for the acquisition of other shares of the appellant. The fact that the beneficiaries of the shares in the Corporation of America were always to be stockholders in another corporation, the Bank of Italy, serves only to designate them. It in no way affects the question of the taxable transfers of rights to stock in the Corporation of America.

Though the June 1917 trust agreement made no provision for it, the authorized capital of appellant was increased on various dates. Prior to March 1926, it had issued in the names of and had delivered to the trustees a total of 200,000 shares, to be held by them under the terms of the trust agreement. No controversy exists with respect to the tax on these issues.

During 1927 and 1928 increases were again made in appellant's authorized capital. In those years 1,800,000 shares of its stock were issued in the names of and delivered to the trustees. When so acquired they were to be held under the same terms as of the trust of 1917. Of these, 600,000 shares were issued pursuant to sales or exchanges, and 1,200,000 shares of stock dividends on the then outstanding shares of appellant, all at the same time as the issuance of the same number of shares in the Bank of Italy to its stockholders.

On all the issues a tax was paid on the transfer from the Bank to the trustees, admittedly properly due. The Commissioner imposed a second tax on each of them as upon a transfer from the beneficiaries to the trustees of a right in the beneficiaries to receive the stock from the Bank. The taxes were paid under protest. The complainant's first cause of action is for the recovery of the amount of the second taxes so assessed and paid.

### The 1,200,000 Shares of Stock Dividends.

So far as concerns the 1,200,000 shares of stock dividends, we assume, for purposes of determining the character of their subsequent issue, that the trustees acquired from the Corporation all the shares on which the stock dividends were subsequently declared, by a transfer from third parties of the right to receive such shares. On this assumption the question is, Is that transfer of the original shares a transfer also of the right to receive stock dividends not then declared but which may possibly be declared in the future?

Such a purpose in the minds of Congress is conceivable, but it is open to the objection that the incidence of the tax is not when the stock dividend is distributed but the time of the transfer of the right to receive the stock to which the subsequent dividend is declared. The stamps are to be affixed then, and their amount, if it includes the right to future stock dividends, is impossible of computation. A more rational concept attributable to the Congress is that the shares, of which the right to receive them is transferred, are those *then* under consideration and to be immediately obtained by the transfer, and not the possible but incalculable future stock dividends which may be declared to the new owners of the stock. The ambiguity, if any, should be resolved in favor of the taxpayer, a principle we are still required to apply. White v. Aronson, 302 U.S. 16, 20, 58 S.Ct. 95, 82 L.Ed. 20.

The later transfer of these stock dividends from the trustees to the beneficiaries, when made, would be subject to tax. It is not contended that such a tax is due. We hold that the issuance of the stock dividend did not enhance the tax, if any, due on the transfer of the shares upon which the transferees received the subsequently declared dividend.

### The 600,000 Shares Originally Created.

The principle determining the taxability of the transfer of the right to receive shares has been established in two recent cases. Raybestos-Manhattan Co. v. U. S., 296 U.S. 60, 63, 64, 56 S.Ct. 63, 80 L.Ed. 44, 102 A.L.R. 111, and Founders General Co. v. Hoey, 300 U.S. 268, 57 S.Ct. 457, 81 L.Ed. 639.

In the Raybestos Case, pursuant to a consolidation agreement, two corporations conveyed their property to a new corporation in return for shares of its capital stock, issued not to the two corporations but directly to their stockholders in proportion to their holdings in those corporations. The opinion states [page 65]:

"The subject of the tax is not alone the transfer of ownership in shares of stock. It embraces transfers of rights to subscribe for or receive shares or certificates whether made upon the books of the corporation 'or by any paper, agreement, or memorandum or other evidence of transfer. * * *' In the present case the generating source

of the right to receive the newly issued shares of petitioner was the conveyance to it of the property of each of the corporations to be consolidated. The new shares could not lawfully be issued to any other than the grantor corporation without its authority, and that authority could not be exercised for the benefit of third persons other than its own assenting stockholders. The consolidation agreement thus imposed the duty on petitioner to issue the new shares upon receipt of the property, and at the same time made disposition to the stockholders of the two corporations of the correlative right to receive the stock.

"* * * * * *

"Here the power to command the disposition of the shares included the right to receive them and the exercise of the power which transferred the right is subject to the tax."

It is then obvious from the above statement that the determining premise is that the *result* of the payment of the consideration, i. e., the conveyance of the corporate property, is the creation in those paying it of the right to receive the stock. The reason the corporation had this right is because "The new shares could not lawfully be issued to any other than the grantor corporation without its authority, and that authority could not be exercised for the benefit of third persons other than its own assenting stockholders. The consolidation agreement thus imposed the duty on petitioner to issue the new shares upon receipt of the property, and at the same time made disposition to the stockholders of the two corporations of the correlative right to receive the stock." Raybestos-Manhattan Co. v. U. S., supra, page 63, 56 S.Ct. page 65.

It is equally obvious that if the payment of the consideration were by a stranger to the issuing corporation and was not intended to and did not create in the payor the right to receive any of its stock, he had no such right to transfer.

So also in Founders General Co. v. Hoey, supra. There it is held it is a taxable transfer of the right to receive stock (page 269, 57 S.Ct. page 458): "* * * When, *at the instance of one entitled to receive stock*, [because of a subscription with the issuing corporation or because of a stockholder relation to it] the certificates therefor are, at his request and for his convenience, issued by the corporation in the name of a nominee who receives no beneficial interest therein." (Emphasis supplied.)

There is no taxable transfer from one *not* intending or desiring to have and not "entitled to receive stock".

The primary consideration with reference to the application of these principles to the several issues of new shares to the trustees, is that the tax is sought to be justified as a tax on the transfer of the "legal title to * * * rights to subscribe for or to receive such shares" of stock and not upon the creation or transfer of beneficial interest in a trust of which the stock is the trust res.

In the light of these principles we consider the relationship of the beneficiaries to the issuing corporation. As to 300,000 shares the beneficiaries did not initiate the proposal to increase their beneficial interest. This was done by the Corporation, controlled by the trustees. The corporation had the usual corporate powers which included the right to agree with all its outstanding stockholders, that is the trustees, how and to whom its stock was to be issued and, if in trust, who should be the beneficiaries.

The obvious right of the corporation to fix the conditions of the issuance of its stock is recognized in the Treasury Regulations for the Act of 1926, under which the Commissioner seeks to sustain the tax. Article 34 provides:

"Art. 34. *Sales and transfers subject to tax.*—The following transactions are subject to the tax: * * *

"(t) The transfer of the right to receive stock which a corporation has unconditionally agreed to issue. * * *"

Stating the question with regard to the 300,000 shares in conformity with the Regulation, it is: Did the corporation condition the issue of its newly created 300,000 shares to the trustees, the sole stockholders, so that the beneficiaries never had a right to have it issued to themselves?

Two assessments on these issues to trustees were made at different times and involve entirely different facts. Obviously there are as many issues of law. Neither of these issues of law nor any others presented as to other stock issues can be disposed of in a lump. In each the litigant is entitled to have the facts stated and the question of taxability determined by the resolving of the question "Did the party alleged to have transferred the right to receive the shares, upon his payment of the

consideration for their issuance, have from the Corporation a proposal which gave him the right to compel the Corporation to issue the shares to him instead of to the trustees, or for damages if not issued to him upon his demand?"

On the first 50,000 issued, what each beneficiary received from the Corporation was a form of purchase warrant describing what he was to acquire by the payment of his subscription price and a blank subscription form for his signature. The stock specified in the warrant is the stock of the Bank of Italy which, the warrant states, is to carry with it a "beneficial interest in the Capital Stock of [the Corporation] held by trustees under an agreement". (Emphasis supplied.)

The subscription agreement refers only to these Bank of Italy shares of stock, specified in the warrant. Incidentally, since the specified stock carried with it the beneficial interest in the trust, their subscriptions entitled them to such an equity. The agreement reads: "The undersigned hereby subscribes for the number of shares of stock specified on the face of this warrant, upon the terms and conditions set forth in the company's circular letter dated September 11, 1926, addressed to stockholders, and agrees to pay the stipulated price of $450.00 per share therefor as provided in the said circular letter." (Emphasis supplied.)

The letter of September 11 referred to is from the Bank of Italy and states that that Bank intends to issue 50,000 of its shares and that the directors of appellant corporation "have also resolved to issue the remaining 50,000 unissued authorized shares of the capital stock of that corporation". The letter also states that the $450 per combined share is to be paid $250 to the Bank of Italy and $200 to the appellant corporation.

The letter does not advise the beneficiaries of anything regarding the resolution of the Corporation other than that it intended to issue its additional 50,000 shares. All that was proposed to the beneficiaries was what was stated in the warrant sent to them with the subscription agreement. There is no intimation to the beneficiaries that they are first to acquire a right to the Corporation's stock and then transfer it to the trustees.

The resolutions themselves, of which the beneficiaries were not advised, provide:

"Be it Further Resolved, that said stock be offered for subscription to the beneficial holders of the stock of said Stockholders Auxiliary Corporation at the ratio of one share to each holder of a beneficial interest in four shares of said corporation;

\* \* \* \* \* \*

"Be it Further Resolved, that such subscriptions be taken and said stock sold in conjunction with a like number of shares of the Bank of Italy, to the end that each subscriber for a share in the Bank of Italy will also subscribe to a beneficial interest in a share of the stock of this corporation and that the said shares held in the Bank of Italy shall carry with them a beneficial interest in a like number of shares of this corporation in the same manner as the stock formerly issued by the Bank of Italy and by this corporation;

"Be it Further Resolved, that the issuance of the beneficial interest herein provided for shall be conditioned upon the signing of a trust agreement similar in form to the one now in effect, which vests in the holders of each share of the capital stock of the Bank of Italy a beneficial interest in one share of this corporation;". (Emphasis supplied.)

As seen, the Corporation chose to ignore the first resolution for offering for subscription to the beneficiaries the stock of the Corporation, and never gave them that opportunity. All they had an opportunity to subscribe to was what was contained in the second paragraph quoted from the resolutions, to "subscribe to a beneficial interest in a share of the stock of this corporation". By such action they could not have acquired a right to anything else. They were never offered the right to pay for the stock and have it issued to them.

The next beneficial interest acquired by the then existing beneficiaries was in 250,000 of a 500,000 shares issue. Concerning this it is stipulated that, "The beneficial interests in the remaining 250,000 of said 500,000 shares were offered to the owners of the beneficial interests of plaintiff's then outstanding stock, to be subscribed for in connection with a subscription for an equal number of shares of stock of Bank of Italy. On October 11, 1927, Bank of Italy sent a letter to all its stockholders, they being also the beneficial owners of plaintiff's stock, informing them of the new issue and of their right to subscribe for shares of Bank of Italy stock and

*beneficial interests* in a like number of shares of stock in plaintiff corporation." (Emphasis supplied.)

Here there were no resolutions designating the subscribers. The beneficiaries received a subscription form and a form of warrant similar to that provided for the first 50,000 shares. The warrant gave to the subscribing beneficiaries the right to: " * * * One share of the Capital Stock of Bank of Italy National Trust & Savings Association, together with a *beneficial interest* in a like number of shares in National Bankitaly Company, at the price of $180.00 per combined share, payable on or before December 31, 1927." (Emphasis supplied.)

It is apparent that the beneficiaries of the trust of the Corporation's shares were offered nothing more than the right to acquire more equities and not the right to acquire the legal title to stock which they in turn transferred to the trustees. True, the beneficiary's payment of the consideration is a sine qua non of the transaction, but the causa causans, the generating cause, of taxability—the existence of a right in the payer of the consideration to receive the stock and its subsequent transfer—here did not exist.

Under the principles established in the Raybestos and Founders General Cases, supra, there were no taxable transactions in the creation of the beneficial interests in these 50,000 and 250,000 issues to the trustees.

This solution is in accord with the clear intent shown by those participating in what the record entitles us to name the Giannini corporations. The control of the Corporation of America was given to the trustees, of which Mr. A. P. Giannini was the head, (hereinafter regarded as a unit and called Giannini) by the trust transaction of 1917, through which Giannini acquired all its stock. It was then the expressed intent of the subscribers that they would not receive or hold any stock, but that their interests would be best served by placing the entire control of the Corporation in Giannini. In all Giannini's subsequent management of the corporation is shown an intent that that stock control would never change. All the documentary evidence shows the whole concept was that the beneficiaries of the trust would best be served by not permitting anyone to have any power in connection with the Corporation but Giannini and persons Giannini chose. It is plainly inferable that a wrong would be done the beneficiaries of the trust if Giannini permitted impairment of this dominance.

The device Giannini used was to *prevent anyone else receiving any new stock of the corporation*. When Giannini desired to enlarge the Corporation's capital, the situation was stated with entire frankness to the beneficiaries of the trust. Giannini said, you will not be given any stock in the corporation, but you may acquire a beneficial interest in the profits of the corporation if you will subscribe a certain amount to increase the corporate capital, computed on the stock Giannini will cause to be issued to Giannini.

Very frankly the subscribers were told, that Giannini had created a status in which "the payment of your consideration gives you nothing but a right to obtain, in the future, certain stock of the Corporation which *cannot be exercised by you until the Giannini trust is dissolved*". It seems clear that this is a case where the Commissioner is claiming a tax on a transfer *from* the beneficiary of a right to receive shares of stock, where the beneficiary came into such a right only through the trust and *still has* the right to receive them.

The words of the statute taxing "transfers of the legal title * * * to rights * * * to subscribe for or to receive shares" of a corporation cannot be interpreted to mean *creation* of an equitable right to receive shares at the termination of a trust in which they are held, with the deliberate intent that the beneficiaries shall *not* receive them until the trust is terminated. There appears no ambiguity in the statute from which any other interpretation may be chosen. If there were such an ambiguity White v. Aronson, 302 U.S. 16, 20, 58 S.Ct. 95, 82 L.Ed. 20, requires its determination in favor of the taxpayer.

The other 250,000 of the 500,000 shares were issued by the appellant to the trustees to be held in trust for the appellant "to create a necessary reserve stock wherewith *in the future* to meet the requirements of employees of this Corporation and said Association under the Employees Special Compensation Plan, at the then market price, and also to provide a means of adequately taking care of and interesting stockholders of banks *hereafter* purchased and merged with the Bank of Italy National Trust and Savings Associa-

tion, as well as other persons whom it may be thought advantageous *to interest* as shareholders of our institutions; * * *". (Emphasis supplied.)

It is absurd to contend that the appellant corporation had a "right to receive" these shares from itself which right it transferred to the trustees on issuance of them. If this were true, every time a corporation issues its own shares to a subscriber there would be a transfer to the subscriber of the right of the corporation to issue to itself stock to be held as treasury stock. As well say that when a man transfers his property to his friend to hold in trust for the transferor, who intends in the future to transfer his beneficial interest to some one else, there is an extra transfer because he might have held the property himself and later declared the trust for the benefit of the third party.

The transfer to the trustees is a taxable transaction, but it is not *two* taxable transfers. It proceeds from the will and the act of the creating corporation, which is controlled by no one but the trustees to whom the legal title is given. True, subsequently the trust may involve *in the future* a transfer of the beneficial interest in the creator, but no such transfer is claimed.

The above disposes of 550,000 of the 600,000 shares under consideration. The remaining 50,000 issue was an entirely different transaction. What was transacted was not with the existing beneficiaries but with a banking company, the Liberty Bank of America. The resolution for this issue provides for an exchange between the Liberty Bank and appellant corporation of the stock of the one for stock of the other. The shares were to be issued to the Giannini trustees, and the shares were so issued. There were no purchase warrants or subscription agreements confining the transaction to a mere acquisition of an increased interest in equities, as it was where existing beneficiaries were allowed to increase their beneficial interests.

This is a true nominee transaction within the decisions of the Raybestos and Founders General Cases, supra, and the issue to the trustees involved a taxable transfer to them of a right in the Liberty Bank to have the shares issued to it.

### SECOND CAUSE OF ACTION.

The second cause of action concerns, not the creation of the beneficial interests, but their subsequent transfers. On March 5, 1928, the stockholders of the Bank of Italy transferred 2,000,000 shares of its capital stock to Transamerica Corporation. On each certificate representing shares in the Bank of Italy there was an endorsement certifying that "the owner of the share of stock represented by this certificate is beneficially interested in a like number of shares of the capital stock of the [appellant], by and under a certain trust agreement". The transfer of the Bank of Italy shares to Transamerica Corporation accomplished at the same time a transfer of the beneficial interest in the trust of the shares of the appellant and of the certificate of the interest.

Under the trust agreement of 1917 referred to in the certificate, the beneficiaries were to have distributed to them by the trustees the dividends of the appellant as soon as they were declared. The dividends, of course, are from the Corporation's profits.

The Commissioner determined that the transfer of the beneficial interests in the stock of appellant was a taxable transaction within the meaning of Title VIII (section 800 et seq.), Schedule A–3 of the Revenue Act of 1926, 44 Stat. 99, 101, and assessed a tax against appellant because of the transfer of these beneficial interests. Appellant paid the tax under protest and, its claim for refund being rejected, brought suit to recover the amount paid.

A tax is imposed on all sales or deliveries of, "or transfers of legal title to shares or certificates of stock or of profits or of interest in property or accumulations in any corporation * * *".

The contention of the appellant is that the statute imposes a tax only on transfers of "legal title"; and that the term "legal title" means the title which is vested in the person in whose name the stock is issued and stands of record, even though such person has no beneficial interest in the stock. In other words, that there could be no taxable transaction unless the trustees themselves had transferred the legal title to the shares or certificates.

There is no merit in this contention. Whether we regard the tax to be on transfers of profits or the legal title to certificates of profits, the result is the same. A "legal title" to a certificate of profit or of interest in accumulations in any corporation, arising from a beneficial interest in a trust, is transferable though the trust

res consisting of the shares to which the corporate profits are distributed is not transferred.

It is urged that since § 2(a) (2) of the same revenue act, 26 U.S.C.A. § 1696 (3), defines the term "corporation" as including associations, joint-stock companies and insurance companies, the phrase · having reference to "profits or * * * interest in property or accumulations in any corporation" should be construed as being limited to beneficial interests in associations and organizations of similar type. This is a refinement of reasoning not justified by the wording of the statute. The language used embraces the transfer of interests of this character "in any corporation". The term "corporation" includes corporations as well as associations and joint-stock companies.

The judgment on the second cause of action is affirmed; on the first cause of action it is reversed as to all but the tax arising from the 50,000 shares exchanged with the Liberty Bank. As to the latter it is affirmed.

HEALY, Circuit Judge (dissenting).

I agree with the opinion of the court so far as it affirms the judgment below, but dissent from the reversal.

I think the case is not difficult of determination if attention be centered on certain basic facts. If we concentrate on the verbiage of the resolutions, subscription warrants and letters, we become lost in a confusion of terms, the precise legal implications of which seem not clearly to have been understood even by the participants.

While appellant was organized for the purpose of operating as an auxiliary to the Bank of Italy, there is nothing in its corporate setup to differentiate it from the ordinary corporation. Its articles or by-laws, so far as the record shows, contain no provision limiting the ownership of its stock to any particular group, or prohibiting the unrestricted circulation of its shares. There is nothing in these confining the issuance of shares to trustees, or authorizing that practice. Nowhere in the governing rules of the corporation itself does anything appear defining the duties or powers of trustees who might become the holders of its stock. Provisions and restrictions of this sort are to be found only in contracts dehors the corporation.

Appellant was not a party to the trust agreement of June 30, 1917. That contract was between the subscribers and the members of the executive committee of the Bank of Italy. Moreover, the 1917 agreement related only to shares then authorized and subscribed for. The contingency of an increase in appellant's capital was not provided against in it. The handling and disposition of future shares were left to be dealt with by the interested parties when need therefor might arise. True, the agreement indicated a policy, but it left to future agreement the working out of the details of the policy as related to future issues of stock. It is also true that as a result of the agreement the trustees obtained the voting power and with it the full control of appellant's affairs, but the power vested in the trustees was not unlimited nor one to be exercised in a purely arbitrary fashion. In a word, when the new stock was issued and sought to be disposed of in 1927 and 1928, there was nothing in the corporate articles or by-laws, or in the existing contract, which in a legal sense authorized the procedure followed by the board, or any other procedure except the normal corporate practice.

Turning first to the transactions involving the sale of 300,000 shares to others than the issuing corporation, it should be kept in mind that appellant had only one class of stock, namely, common stock. Its articles provided for no security denominated "beneficial interests." It had no security of that kind for sale, and, I think, could not offer for sale or sell something it did not have, any more than it could sell preferred stock or securities of other types, when none had been authorized. All it had to dispose of was common stock, and this it proposed to sell at a given price per share.

The initial resolution providing for the sale of 50,000 shares indicates this clearly enough. The opening paragraph is as follows: "Be it Resolved, that the 50,000 shares of the capital stock of Stockholders Auxiliary Corporation[1] now remaining unissued be offered for sale at and for ´the sum of $200 cash per share, said shares to be issued to trustees subject to the same agreements and trusts as shares heretofore issued." In substance, and indeed in form, what the board of directors of appellant proposed was to sell these shares,

---

[1] Such was the then name of appellant.

subject to the condition that the shares be issued to trustees.

It is said that the purchasers were not offered stock, but only a beneficial interest. However that may be, the stock itself was sold. As a consequence of the sale the shares were issued, certificates evidencing them were delivered, and the full purchase price received by appellant. If the analogy to an ordinary sale is present, it is permissible to say that appellant irrevocably parted both with legal title and possession. If the stock was not sold to the individuals with whom the corporation dealt, it is fair to inquire to whom it was sold. Not to the trustees, surely. The opportunity to purchase was not offered to them, the stock was not subscribed for by them, and they paid no part of the purchase price.

Perhaps a more restricted argument is intended, namely, that the purchasers were not offered an opportunity to obtain legal title to the stock. The argument, as it seems to me, gives only a partial or negative statement of the offer. Putting it affirmatively, it amounts to no more than what I have already said, that the purchasers were offered the opportunity to buy the stock subject to the condition that the legal title to it be transferred directly to trustees. It is undeniable that appellant parted with its legal title as a result of the sale, hence it must have sold the legal as well as the equitable title. It did not sell the legal title to trustees and the equitable title to the other parties, for the trustees purchased nothing. Nor can it be thought that appellant sold an equity in the stock and gave away the legal title, for a corporation cannot lawfully give away its stock or any interest in it, legal or equitable.

It is elementary that the powers of a corporation are to be determined by reference to the corporate articles and by-laws and the statutes of the state. These had vested in appellant no inherent power to sell the corporation's shares to one person and deliver the certificates to some other person as trustee. Nor does appellant appear to have been free, under the state law, to dispose of its new issues without first offering them to the beneficial owners of its existing shares. Recognition of this fact is seen in the circumstance that the latter were requested to waive their rights in respect of the 250,000 shares proposed to be sold in trust to appellant to meet the purposes of a special plan. It is suggested, in effect, that the Giannini group, who were at once the directors and the trustees, were in full control of appellant and thus in position to impose their will. While granting this, we are not permitted to ascribe to the corporate board a purpose to act without authority of law or contract, and this is true however benign their objective.

Looking at the matter from the standpoint of the trustees, it seems equally clear that they had no inherent right to demand the issuance to themselves of shares for which they had furnished no part of the consideration. Their relationship with the individuals who were the beneficial owners of the outstanding shares was purely contractual, and they had no contract with these individuals relative to the offered shares. It may be assumed that they had a duty to effectuate the policy evidenced by the original trust agreement, but the duty could not lawfully be performed without the assent of the individuals with whom the corporation itself was under the necessity of dealing. Here, as in Raybestos-Manhattan, Inc. v. United States, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44, 102 A.L.R. 111, the "generating source of the right to receive the newly issued shares" [page 65] was the payment to appellant of the purchase price exacted for them, and this consideration was furnished by persons other than the trustees.

We are driven, as it seems to me, to the alternative that the power of appellant's board to proceed as it did, as well as the authority of the trustees to receive the shares, necessarily had its source in the agreement or assent of those with whom the corporation dealt. The act of Congress imposes a tax on transfers of rights to receive shares, in whatever manner such transfers may be evidenced, "whether * * * shown by the books of the corporation, or by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer." 44 Stat. 101. It is apparent that the agreement, if that be the form the transfer takes, need not be in writing, nor need it be express. It may be implied from the circumstances and the conduct of the parties. It may arise from the imposition of a condition, the tacit acceptance of which effects the agreement. "It is enough," as said by Justice Stone in Raybestos-Manhattan, Inc. v. United States, supra, "if the right or interest transferred is, by any form of pro-

cedure, relinquished by one and vested in another."

It is conceded that if one buys corporate stock and directs the issuance of it to trustees for his benefit, he initiates a taxable transfer of his right to receive. We do not have in such instance a transfer by agreement, but merely a unilateral act. But one who agrees that stock which he purchases shall be delivered to another effects a taxable transfer of the right to receive just as much as if he had, of his will alone, directed that course of procedure. It makes no difference if the arrangement in which he participates calls upon him to forego, at the inception, the right to receive the stock he pays for. It is not essential to the tax that one first acquire the right to receive, and then by subsequent act transfer it to a third person. As indicated in the Raybestos-Manhattan Case, supra, the transaction is taxable notwithstanding that the sale of the stock is made and the surrender of the right to receive it "effected simultaneously in a single document."

The transaction between appellant and those who paid the purchase price of its shares cannot be considered otherwise than as a contract, resulting in the delivery of the shares to trustees. This disposition of the shares was necessarily one of the terms of the contract; hence, by agreement, the right to receive the shares they had paid for was relinquished by the purchasers and became vested in the trustees. When the purchasers manifested their assent to the proposal made to them, by paying the specified price for the shares offered, and the proposal was carried out, two taxable transactions ensued, (1) the transfer of the stock to the trustees, and (2) the relinquishment or surrender to the trustees of the buyers' rights to receive the shares which they had paid for. It does not matter whether the assent of the purchasers to this form of procedure was given gladly or reluctantly, or whether assent was wrung from them as a condition precedent to their participation in the transaction at all.

The result need not shock our sense of justice. The purpose of the act of Congress was not to define methods of transfer or disposition of corporate stock, but to produce revenue. The greater the number of transactions becoming subject to the tax the more nearly is the object of the statute achieved. As said in the Raybestos-Manhattan Case, supra, "the reach of a taxing act whose purpose is as obvious as the present is not to be restricted by technical refinements." And the court there said that the language of the act "discloses the general purpose to tax every transaction whereby the right to be or become a shareholder of a corporation or to receive any certificate of any interest in its property is surrendered by one and vested in another."

In discussing the issuance of 250,000 shares to the trustees to be held in trust for appellant to meet the requirements of an employees' compensation plan, and for other purposes, the main opinion says that "it is absurd to contend that the appellant corporation had a right to receive these shares from itself, which right it transferred to the trustees on issuance of them." I see nothing absurd in the contention. The nature of this transaction is described by appellant in its letter to the shareholders in which it is said, "250,000 of said shares will be sold to Bancitaly Corporation[2] at a price of $180 for each combined share." It was stipulated that "250,000 * * * shares were issued to the then trustees under the said trust agreement of June 30, 1917, to be held by them under the terms of said trust agreement for the benefit of Bancitaly Corporation." In other words, appellant purchased and paid for this block of its own shares and caused the shares to be issued to trustees to be held for its benefit. It seems obvious that the appellant participated in two taxable transactions, (1) the transfer of these shares to trustees, and (2) the transfer to the trustees of the right to receive them. Manifestly the corporation could have taken title to these shares in itself, or made such other disposition of the legal title as it saw fit. It chose to direct that the legal title be vested in the trustees.

I have suggested that the agreement to transfer need not be express, but may be implied. However, it seems to me that an express transfer of the right to receive is clearly to be spelled out in the situation before us; and this is true in respect of the shares issued as stock dividends as well as in the case of those sold.

It was stipulated that "at all times subsequent to June 30, 1917 all of the stock of plaintiff corporation was issued in the

---

[2] This was the then name of appellant.

names of the trustees under said trust agreement of June 30, 1917 and held by said trustees *under the terms of said trust agreement* for the benefit of the owners of the beneficial interests in said stock of plaintiff corporation." (Emphasis supplied.) As has been said, the 1917 agreement related only to shares then authorized and subscribed for. While in the proceedings of appellant's board relative to the new issues there is language indicating unmistakably that the execution of new trust agreements was thought necessary, it does not appear that any were actually formulated. It seems obvious that the board could not, by mere fiat, declare the old agreement operative in the case of shares not affected by it, and I think the board did not undertake so to declare. The terms of the old agreement were made effective in a different fashion.

As evidence of the rights in appellant's shares, both those representing stock dividends and those sold, the following indorsement was made upon each Bank of Italy certificate: "The owner of the shares of stock represented by this certificate is beneficially interested in a like number of shares of the capital stock of the [appellant corporation], by and under a certain trust agreement, which beneficial interest is subject to all the terms, conditions, obligations and limitations of said agreement." The trust agreement referred to is obviously the 1917 agreement. It is elementary that the parties concerned by accepting certificates so indorsed became bound "by all the terms, conditions, obligations and limitations" of that agreement. In legal effect they adopted the instrument as their own.

One of the terms of that agreement was that the subscribers "hereby respectively transfer, assign and set over and agree to surrender in trust, upon the trusts hereinafter declared, unto the [trustees] * * * all the right, title and interest * * * in and to the shares of stock, and all the shares of stock of [appellant corporation] * * * and hereby agree to the issuance of, and hereby authorize, empower and direct said [appellant corporation] to issue, the certificates of stock to * * * said [trustees]." Here, I think, is an express transfer of the right to receive. Had a new agreement between the trustees and the beneficial owers been entered into with each new stock issue, substantially identical in its terms with the original, the surren-

der of the right to receive the shares could not have been more clearly manifested.

What has been said, I think, disposes of the taxability of the stock dividend transactions, as well as the taxability of the transactions involving sales. In relation to the former, however, there is the added circumstance that under the terms of the trust agreement the beneficial owners were entitled to receive all dividends on appellant's stock. The acceptance of the indorsed certificates evidencing the beneficial interest in the dividend shares evidences also the transfer to the trustees of the right to receive them.