**MALONEY, Collector of Internal Revenue,
v. PORTLAND ASSOCIATES, Inc.
No. 9197.**

Circuit Court of Appeals, Ninth Circuit.
Jan. 22, 1940.

Samuel O. Clark, Jr., Asst. Atty. Gen.,
Sewall Key, Norman D. Keller, S. Dee

Hanson, and Ugo Carusi, Sp. Assts. to Atty. Gen., and Carl C. Donaugh, U. S. Atty., and Manley B. Strayer, Asst. U. S. Atty., both of Portland, Or. (Thomas R. Winter, Sp. Asst. to U. S. Atty., of Seattle, Wash., of counsel), for appellant.

Clarence D. Phillips, of Portland, Or. (Griffith, Peck & Coke, of Portland, Or., of counsel), for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

Appellant suffered a judgment rendered against him for an alleged illegal exaction from appellee for stamp taxes and appeals.

Appellee was organized as an Oregon corporation on April 6, 1931, with an authorized capital of $350,000 consisting of 350,000 shares of stock having a par value of $1 each. On May 1, 1931, each of four persons subscribed for one share of stock. In addition, one C. R. Griffith subscribed for all the remaining stock (349,996 shares) upon the condition that appellee would accept as payment therefor a lease covering certain real property in Wyoming, and a drilling contract, and also agreed that if appellee accepted his offer, he would "donate 249,996 shares of said capital stock to the corporation for sale by it upon such terms and conditions as it may desire to sell the same or for use by it in any manner it desires, subject however to a voting trust agreement to be executed prior to the time said stock is delivered to" appellee.

The five subscribers executed a voting trust agreement whereby they agreed to transfer the legal title to all their stock to three trustees who were to vote the stock, issue voting trust certificates, distribute any dividends received proportionately to the voting trust certificate holders, and further agreed that the trust should exist for five years. In accordance with the foregoing, certificates of stock were issued to the respective subscribers. A tax upon the original issue of such stock was paid. Thereupon C. R. Griffith assigned and delivered his certificate for 349,995 shares to the trustees who presented the certificate to appellee and received a new one in the names of the trustee for the same number of shares. A tax was paid on such transfer.

On October 1, 1932, appellee's articles of incorporation were amended, changing the par value of the stock from $1 to no-par stock, and increasing the number of shares to 750,000, pursuant to meetings of the stockholders and directors of appellee on September 22, 1931. At these meetings it was resolved that the increased stock should be sold for $1 or issued for property of that value; that each and every share of the increase of the stock which was issued, sold or disposed of, should be subject to the voting trust agreement previously mentioned; that there should be issued to each purchaser of the increase of the stock, a voting trust certificate; that there should be issued to the trustees certificates of stock "for a corresponding number of shares so sold"; and that the money paid for the voting trust certificates should then go into the corporate treasury.

On January 27, 1932, the directors of appellee adopted a resolution that in consideration of the agreement of one Stock to pay certain indebtedness of a subsidiary "this corporation hereby grants to said Paul Stock the option to purchase 15,000 shares of the capital stock of this corporation at $1.00 per share at any time prior to July 31, 1932". It was also resolved that in consideration of his lending appellee $10,000, one Battleson "be and he hereby is granted an option to purchase 10,000 shares of the capital stock of this corporation at any time prior to July 31, 1932, at the price of $1.00 per share". It was further resolved that in consideration of his lending this corporation $10,000, one Griffith "be and he hereby is granted an option to purchase 10,000 shares of the capital stock of this corporation at any time prior to July 31, 1932, at the price of $1.00 per share". The options were not exercised by anyone. Whether or not these options are taxable as "agreements to sell" is one question presented here.

Appellee's directors, on February 19, 1932, adopted a resolution authorizing issuance of "original shares of the capital stock of this corporation from time to time as may be required to cover issued trust certificates under" the voting trust.

The trustees delivered the certificate for 349,995 shares of the $1 par stock to appellee and received, on April 5, 1932, a certificate in their names for 505,000 shares of no par stock. The new certificate represented 349,995 shares of the $1 par stock exchanged for the same number of shares of no par stock, and 155,005 shares of the increase of stock which had not theretofore been issued. A tax was paid on the original issue of 155,005 shares of stock to the trustees. The issuance of the 155,005

shares of stock was to represent the stock covered by voting trust certificates previously sold to various individuals. Appellant contends that the foregoing transaction amounts to a purchase by the individuals of the stock, and a transfer by them to the trustees of their right to receive such stock. Whether or not a tax upon the transaction based upon the contention stated is proper, is a second question presented.

The third question presented arises from the fact that the individuals mentioned in the preceding paragraph who had obtained voting trust certificates had not deposited the stock represented by such voting trust certificates with the trustees. It is contended that therefore the transaction amounts to a transfer by the trustees to the individuals mentioned of the right of the trustees to receive the voting trust certificates representing the stock so deposited.

Section 800, Schedule A(3) of the Revenue Act of 1926 (44 Stat. 9) levies a tax: "On all sales, or agreements to sell * * * or transfers of legal title to shares or certificates of stock or of profits or of interest in property or accumulations in any corporation * * * whether made upon or shown by the books of the corporation * * * whether entitling the holder in any manner to the benefit of such stock, interest, or rights, or not * * *." The Revenue Act of 1932 (47 Stat. 169) by § 723(a) (3), 26 U.S.C.A. § 902(b), has a similar provision.

Treasury Regulations 71 promulgated under the Revenue Act of 1926, provides in part:

"Art. 29. Issues Not Subject to Tax.— The following are examples of issues not subject to the tax: * * *

"(e) The issue of voting-trust certificates * * *

"Art. 34. Sales or Transfers Subject to Tax.—

"(a) The sale or transfer of shares of stock, whether or not represented by certificates.

"(b) The transfer of stock to or by trustees.

"(c) The transfer of voting trust certificates * * *

"(s) The transfer of legal title to stock which a corporation has unconditionally agreed to issue * * *

"Art. 77. * * * (2) * * *

"(b) The term 'agreement to sell' includes options * * * offers * * *"

■ Appellee contends that the resolutions do not "rise to the dignity of being options". We disagree with that contention. The words used expressly denote an intention that options be thereby granted. The trial court held that an "option is a continuing offer and does not become an agreement to sell until the offer is accepted by the exercise of the option"; that options were of such general use and their meaning so "well-understood" that Congress would have used the word "options" had it intended them to be taxable; that taxing statutes were not to be extended by implication beyond the clear import of the language used; and that any ambiguities in such statutes "are to be resolved in favor of the taxpayer".

Technically speaking, we suppose the resolutions adopted were contracts to make an offer to sell the stock, irrevocable for the time stated. They were not "agreements" to sell in the sense that one party promised to deliver stock, and the other person promised to buy the same. The words in the statute are "agreements" to sell and not "contracts" to sell, if accuracy is important. The question resolves itself into a narrow question as to whether the word "agreements" in the statute was loosely used to cover a "promise" or an "offer" to sell. That the word was evidently so intended is made clear in Treat v. White, 181 U.S. 264, 21 S.Ct. 611, 45 L.Ed. 853, where "calls", which were actually options, were construed as "agreements to sell", regardless of the fact that the offeree did not accept the offer. Upon the authority of that case, we hold the options to be taxable. In this connection, we add that there is considerable doubt as to the present existence of the old rule to the effect that ambiguities in a taxing act are to be resolved in favor of the taxpayer. See White v. United States, 305 U.S. 281, 292, 59 S.Ct. 172, 83 L.Ed. 179; United States v. Merchants Nat. Trust & Savings Bank, 9 Cir., 101 F.2d 399, 404, with which compare United States v. Pleasants, 305 U.S. 357, 363, 59 S.Ct. 281, 83 L.Ed. 217. Recovery under the first contention, supra, should be limited to $700—the amount stipulated by the parties to be the amount of the over-assessment in the event that appellant's contention was upheld here.

The facts related above regarding the second question may be summarized by

saying that voting trust certificates representing stock of appellee not then held by the trustees, were sold, and the money received was used by the trustees to acquire the necessary stock. The purchasers intended to buy voting trust certificates, and received such certificates. Appellee contends that the purchasers of the voting trust certificates at no time had the right to receive appellee's stock, and therefore there could be no taxable transfer.

Where a corporation conveys its assets to a second corporation for stock in the latter, the direction of the first corporation, to issue such stock directly to a third person, is a taxable transfer by the first corporation of its right to receive the stock. Raybestos-Manhattan Co. v. United States, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44, 102 A.L.R. 111; Founders General Corp. v. Hoey, 300 U.S. 268, 57 S.Ct. 457, 81 L.Ed. 639; Standard Oil Co. of California v. United States, 9 Cir., 90 F.2d 571; United States v. Revere Copper & Brass, 2 Cir., 100 F.2d 391; United States v. Brown Fence & Wire Co., D.C. Ohio, 9 F.Supp. 1008, affirmed 6 Cir., 88 F.2d 1005; United States v. Vortex Cup Co., 7 Cir., 84 F.2d 925; American Gas Machine Co. v. Willcutts, 8 Cir., 87 F.2d 924.

The same principle is applicable where it is clear that a person subscribes for stock under the condition that by his subscription he thereby directs the corporation to issue the stock to voting trustees who are to issue voting trust certificates to the subscribers. In re Consolidated Automatic Merchandising Corp., 2 Cir., 90 F.2d 598; Ladner v. Pennroad Corporation, 3 Cir., 97 F.2d 10; Cliffs Corporation v. United States, 6 Cir., 103 F.2d 77; B. F. Avery & Sons Co. v. Glenn, 6 Cir., 106 F.2d 613. In such cases it is clear that the steps taken, in effect, are: the subscriber has the right to receive the stock, but since his contract binds him to simultaneously transfer his right to trustees, (i. e., the legal title), the useless steps of transferring the stock to the purchaser and having the latter transfer the legal title to the trustee is eliminated, and as a matter of expediency, the stock is issued directly to the trustees. By either method the subscriber receives a voting trust certificate representing the equitable interest which was not transferred to the trustees.

On the other hand, we know of nothing which prevents a corporation from selling or transferring legal title to its stock to one person, and the equitable title to such stock to another. In such event, the purchaser buys and receives nothing but the equitable title, and the other person buys and receives nothing but the legal title. The owners of the respective interests after issue by the corporation, make no transfers between themselves, and there being no transfers, there is, of course, no tax. Corporation of America v. McLaughlin, 9 Cir., 100 F.2d 72; White v. Consolidated Equities, 1 Cir., 78 F.2d 435.

Whether the transaction is in effect a transfer of both the legal and equitable interest to the purchaser, or a transfer of the equitable interest to one person, and the legal title to another, depends upon the facts of the particular case. There is little evidence bearing on the question in the record before us. The resolution of September 22, 1931, regarding increase of appellee's capital stock, speaks of sale of the "stock" but at the same time makes it clear that purchasers were to receive nothing but voting trust certificates.

The president of appellee (succeeding C. R. Griffith) testified as follows:

"Q. Can you tell the Court what the corporation received for that 155,000 new shares? A. Varying prices for the stock as it was sold by agents of the corporation, who made sales in accordance with the directions of the directors, as also shown by the minutes, and advised the voting trustees to turn the money to the treasury of the bank [corporation?], whereas the treasurer of the corporation authorized them to issue voting trust certificates."

The foregoing evidence, as will be seen by reference to other evidence, is as consistent with one theory as the other. It discloses, however, that the purchasers bought from agents, not of the "trustees", but of the corporation. The president further testified:

"Q. * * * Now, whenever a purchaser of any part of the capital stock, of the increase in capital stock, purchased stock he was not given the stock but he was given a voting certificate? A. He was not purchasing stock, he was purchasing a voting trust certificate entitling him to receive the evidence of legal title of a share of stock at the expiration of the voting trust.

"Q. Well, the corporation sells the stock, doesn't it? A. It transferred the stock to the voting trustees, so the control would be left there. The purchaser received only

128

trust certificates, that is what he bought, that is what he got.

"Q. That is what he got, but it was represented share for share of corporate stock, was it not? A. Everybody understood when they bought the stock or the voting trust certificates they were buying voting trust certificates, which would entitle them to a certificate of stock for the same number of shares at the expiration of the voting trust."

We think it is clear from the above that the purchasers bought only an equitable interest in the stock from the corporation, which they at no time transferred. The voting trust certificates were merely evidence of their equitable interest, and necessarily were issued by the owner of the legal title to the stock. The transaction was, we think, the same as if the corporation had issued directly to the purchasers a written instrument transferring to them only an equitable interest, and issuing to the trustees a written instrument transferring to them only a legal interest. In either form, there is no transfer by the equitable owner of the legal title, because he did not have a legal title to transfer.

Conversely, the trustees at no time purchased, received or had the equitable title to the stock, and could not, therefore, have transferred it to the purchasers. Since the equitable interest was represented by the voting trust certificates, and the trustees did not have the right to receive the equitable interest, it follows that they did not therefore transfer a right to receive the voting trust certificates and appellant's third contention must fail.

The judgment is modified as above stated, and as modified, is affirmed.